Case 21-5359, Ronald Burns v. Berry Global Inc. Oral Argument, 15 minutes per side. Ms. Hornback for the appellant. Good morning. May it please the court, counsel. My name is Catherine Hornback and I represent the appellant, Ronald Burns. And I just want to note that I have reserved four minutes for rebuttal, please. It is undisputed in this case that Ronald Burns is a member of a protected class and that he was subjected to severe unwelcome racial harassment that created our hostile work environment while employed at Berry Global Incorporated in Nicholasville, Kentucky. The question before the court today is whether taking the facts in a light most favorable to Ronald Burns is very liable for that harassment. In order for the court to uphold the district court's ruling, there must be a complete absence of pleadings or proof regarding the employer's liability. The facts in this case show that Berry manifested an indifference or unreasonableness in its response to the horrific harassment Ron endured. The purpose of Title VII is remedial, to end current harassment and to deter future harassment. In this case, the efforts of Berry Global did not occur. The perpetrator was never identified. An employer may be held liable when its remedial response is merely negligent, however well-intentioned. In this case, one of the first issues that we have addressed is with regard to who the actual perpetrator was. And there are two different speakers, as you know, one for supervisors and one for co-workers. In this case, the court dismissed our allegations that it could possibly be a supervisor who was involved in this harassing behavior. In this case, we rely heavily on the eloferic defense. In this case, there is not a tangible job detriment that has been alleged from a direct supervisor and said this is a harassment type of case. In this case, they have to show that the employer exercised a reasonable care to prevent and to correct promptly any sexually or racially harassing behavior. And then second, that the employee failed to advise itself of those preventive or corrective measures. And then in this case, the issue has been whether or not there was any proof in this record at all, whether or not a supervisor was involved. The lower court determined that because Barry had a affidavit they supplied saying that the gentleman that we believe might have been the perpetrator, Mr. Bell, that their supervisors had no ability to make any tangible job detriment for Mr. Burns, and therefore he could not be a supervisor. I think that does discount a part of Vance v. Ball State in which the U.S. Supreme Court discussed what it means to be a supervisor in these cases. What was the record evidence that would support that he was a supervisor? Yes, just getting there. So in this case, on the first incident in which Mr. Burns had an issue with regard to a dance monkey note put in his locker, he reported that to the manager who was there at that time. That was Jeff Bell. He was the only manager that was in the building at that time. He was the only supervisor. And so if you look at Vance, there is an argument there that says, if a company like Barry has made a very small number of people to be the ones who are allowed to make these tangible job decisions. So he was the only one in the building, but did he have the power to hire, fire, do any? I mean, what was the evidence that he had tangible supervisory power over the plaintiff, Mr. Burns here? Right. The argument that we use in this case is the part in Vance versus Ball State in which they talk about the employer may be held to have effectively delegated the power to take tangible employment actions to employees on his recommendations. It relies. So in this case, our argument is that Mr. Bell in the only supervisor in the entire building at the time this went down would be the one who the people that are able to make these tangible efforts would have to have relied upon. It would have had to relied upon his decision making his opinions in regard to what was done in this case. And so that it is that part of the argument that we rely upon. And in fact, this affidavit only came in a reply to our summary judgment. There was never, ever any formal proof taken upon whether or not Mr. Bell might have been having might have had that kind of authority over Mr. Burns. So in this case, we would argue that there is an argument here to be had that this supervisor could have been one who would have been entitled to that vicarious liability and the proof in this case with the second element under a supervisor. Our defense is that the employee did not take advantage of the corrective measures. In this case, it's very clear that Mr. Burns did. And therefore, Barry, if he is a supervisor, would have been liable for the information that happened. But even if you determine that the supervisor, he was not a supervisor in this situation. The co-worker standard is also important, and it is talking about whether or not they knew or should have known Ron reported it. He reported it to the corporate headquarters via their line as well. He reported it to the police, he reported to the EEOC. There's no question that they did not know. And so it really comes down to whether or not Barry failed to take prompt and appropriate corrective action. So the employer is liable if its response manifests indifference or unreasonableness in light of the facts that the employer knew or should have known. And so at this point is when we have to get into the facts of this case and really what happened. So in this case, Ron Burns, he was a maintenance technician. He was hired as a temp there in January of 2018. And then August of 2018, he was hired permanently. His first day of permanent full-time employment was August the 6th. On August the 7th, at about shift change, he went to his locker and found a handwritten note that said Dance Monkey on it. What are the facts? I mean, I cut to the chase here. I mean, I don't I look at this case and I look at the investigation that the employer did, and it seems like they did a fair amount. They interviewed people and they looked at videotapes. They changed some policies, the positioning of cameras, lockers, whatever it is that I mean, it may not. Obviously, they didn't find the perpetrator. I don't know that they have to. It just seems like on the facts here, it doesn't seem nearly as egregious as some of the other cases that we've had where the employer has essentially completely ignored. We're done almost nothing in terms of investigation. Why do you think this investigation? I mean, what is it about it that that actually falls short in your mind? Easy, easy question. So in this case, what we're talking about with Title seven is there needs to be a deterrent to it as well. And so as the the harassing behavior gets worse, their responses need to get more intense and their response needs to stop this nip it in the bud. And so they're in the district court's opinion, there was a lot of things that were incorrectly reported about what went on. So we've got this first one, Dance Monkey. What do they do? They start looking at video and their video is turned down to look at people's feet. So they're trying to determine what these clothing are and they do that for about a week. And in the meantime, that allows in for a second incident to happen and that Ron goes to his locker. And once again, there's a noose hanging on his locker because in the first place, the employer never told people they were investigating. Never even told them this Dance Monkey thing can happen. They're trying to figure out who it was. So we get to the second spot. Then now it's escalated. He's now got a noose, which I would consider to be close to a death threat kind of a thing going on. So at this point, they take it a little bit more seriously. So that's when he reports only to Jeff Bell, who is the only supervisor in the whole place about this and why we think that he should be someone who could be considered having that ability to make good decisions for him. And so they at one point, they said that they met with employees on that night. That is not truthful on the record. We have not seen anything with that. They never interviewed Ron Burds this time. So he contacts the ethics hotline. At this point, then Jamie Long, who is their HR director. So this is about seven days after the accident. She's she starts interviewing employees. And so what she asked them is, have you seen anything questionable? Have you heard anything to make you uncomfortable? Have you seen anything offensive? And in during this, she doesn't show them the sign. She doesn't show them the news or any of those things. And she continues to review the video. One of the things she finds out from this, this interview she did is hate is bad in here is from one of the people. She doesn't follow up on this. Hate is bad in here. And so then they inform Ron that this investigation is over and it's inconclusive. And they've implemented this four part plan. The supervisors are going to look these walkthroughs of locker. They're going to continue to look for appropriate location to put lockers and they are going to do a refresher training. And so at this point, they close the ethics hotline and they said appropriate action has been taken. And the four things they said that they were going to do, they don't do the fourth one at all. The supervisors walkthrough, I would direct you all to the email that goes from the. The supervisors, which really asked them to look at and see if they find any offensive written materials anywhere in the lockers, and they don't start documenting these walkthroughs until August the 20th. That's 13 days after Vance Monkey and nine days after the news. And there's a lot of questions about the training they did. They completed the entire training, except for five people by August the 23rd. And during this training, the proof is that it lasts about five minutes. It's attached to a safety training. The the reports they did for the questions for the people who attended it had nothing to do with racial harassment. I would direct you to Barry's harassment policy is primarily sexual harassment. There's a shout out to racial harassment, but not much. It didn't do anything more. A code of respect does not address that either. And so they did no. So we have no slides, PowerPoint presentation, nothing to what went on in this. Our client says it was mostly about don't deface company property. So what happens the day after they do this training? Brian finds a note in his locker that says, die nigger. Then they do nothing else, really. They once again, they wait another five days in the week. They talk to 17 employees. They ask the same big question. They don't ask anything about this. I do no additional training. They do nothing else. As a matter of fact, in November, their VP of Human Resources, when Ron causes a complaint, says Ronald Burns. So they they have done a lot of nothing is what they have done. You'll have your final time. All right. So she may proceed. May it please the court. Back. Good morning, Your Honor. My name is Megan. You tell us. I represent the defendant happily in this case. Very global. Ms. Hornback was correct in stating that we are here, that there were horrific and unacceptable actions taken against Mr. Burns as a result of his race. But as Judge Reed in the Eastern District of Kentucky noted in his opinion, the question before the court here today is not whether these incidents should be ignored or go unanswered, but simply whether Barry should have to answer for them and be held liable. Judge Reeves thoroughly reviewed the law and the record of it. And in a 34 page opinion found that Barry's response was prompt, sufficient and reasonable, despite the lack of success in identifying the perpetrator. And that they should not be held liable for the actions of the unidentified perpetrator. And I would ask them to affirm that decision today. As Ms. Hornback also noted, the first issue that we have to deal with in response to the hostile work environment claim is which standard of liability should apply. The supervisor standard or the co-worker standard. We submit that it should be the co-worker standard. And if we're specifically looking at the evidence here in this case, the only supervisor that Mr. Burns potentially identified as a possible suspect is Jeff Bell. As the Vance B. Wall State case stated, that in order to be a supervisor under Title 7, you have to be empowered by the employer to take tangible employment actions against the victim, not even other employees, but specifically against the victim here. And so tangible employment actions are going to include those significant actions of hiring, firing, promoting, transferring, demoting, or probably a significant change in responsibility. The record evidence here from the deposition testimony had basically little to no information about Jeff Bell. The only question I was asked from plant manager John Edwards is who was Jeff Bell? And he said a day shift production supervisor. Other than that, no one was asked about Jeff Bell, what his responsibilities were and specifically what his responsibilities were to Mr. Burns. Was that argument, was that theory apparent from their complaint? I don't remember. I'm just curious why that that affidavit came in after the like when you were doing the summary judgment briefing as opposed to during discovery. It was not apparent from the complaint. And again, it somewhat came as a surprise to us that they were going to rely on the supervisor standard and Jeff Bell. Obviously, plaintiffs did testify in the deposition that his supervisor, the maintenance supervisor, Charlie Bowman, mentioned at one point Jeff Bell was a potential suspect. But Jamie Long and John Edwards clearly discussed that fact and that Jeff Bell was never a suspect because he was never seen on the video footage of entering the restroom. And furthermore, in terms of the deposition evidence, what was out there before we had to submit the affidavits in our reply to the summary judgment motion is Robert's own testimony about his interactions with Bell. First of all, Ron testified Bell was in no way responsible for his hiring. That was Charlie Bowman and the plant manager. He also testified that since him and Bell were opposite shifts, Mr. Burns worked the night shift and Mr. Bell worked the day shift. Well, he didn't really speak with him much. And he also indicated that their communications pretty much involved collaborative type communication, meaning that he would update Bell as he was going off shift to let you know if there were any issues that occurred during the night. That was the only evidence that was in the record at the time when the response to the summary judgment motion was filed. Plaintiffs then relied on this argument that Jeff Bell was a supervisor. And so given that there was no evidence in the record specifically about Bell's supervision and authority over Burns, we submitted a declaration to speak to that, which is clearly right in line with Rule 56. And it certainly does not serve as this sham affidavit doctrine because they didn't contradict any evidence that was in the record. Eyewitnesses were simply not asked any sort of questions about Bell's supervisory authority over Burns. And we would submit that the fact that he was the only person in the plan on a Saturday when one of these incidents occurred, did not somehow give him the supervisor authority to carry out these tangible employment actions against Burns. Second, if we were to assume for purposes of argument that Bell is a supervisor, we believe the record evidence clearly shows that he in no way was a potential suspect here. I believe the statements made by Mr. Burns in his briefing are misrepresenting the testimony in the record. And the only thing that Mr. Burns can rely on is this alleged conversation that Mr. Bowman had with him again, where he simply just mentioned that Bell was a suspect. As Mr. Burns stated in his deposition, he adamantly, or Bell was still adamant that it was Jerry Morton. That's the individual who Barry identified as actually being on the video evidence on each of the three occasions. And that is the individual who they immediately suspended when the death threat note was found on August 24th. Counsel, this is Judge Rogers. I think it might be useful to move on to the coworker standard. This is a little troubling that they just ask questions like, have you seen anything unusual? I can think that. I mean, it just seems like that's not designed to elicit answers. People wonder, what do you mean unusual? So and so wore a bright dress or something. I mean, it just, you know. I understand, Your Honor. And I think Ms. Long explained that in her deposition. And it's first of all, I think that the statement by Ms. Hornback that there was there's no evidence in the record that the employees were told about these events is not true. John Edwards specifically testified that he had meetings with the employees. Now, Mr. Burns is stating he was not present for the meeting with his shift, but he would not have been present for the meeting with just one, which occurred on August 11th, the day that the news was found and Mr. Burns even testified if he left immediately after finding that as it happened a little bit after the shift change. So this is this is a small facility to there is 50 employees that were there. John Edwards told all the supervisors, you can see that from the email evidence about conducting the walkthroughs from Mr. Burns testimony that Charlie Bowman came up to him, told them about the video evidence that they were viewing. Donnie Conister, another production supervisor, came to him and he was the one who originally said this is live stream only, which was inaccurate. So clearly, the incidents were communicated to the supervisors and they were already looking into it. Mr. Burns testified himself. He never told anyone about anything. So the only way people would have known is if the supervisors were told and then the employees. The notes from as long interviews reflect that the employees were stating things like, I don't know anything about this situation. I heard about it from the meeting with the plant manager. Clearly, it was clearly communicated to them what happened and they were aware of that when they went in for the interview. And this long also testified that she did give some sort of explanation as to why they were there. She didn't show them the note. Correct. And she did have some very open ended questions, but they all understood why they were there. Everyone was talking about this. Mr. Burns even said that employees came up to him and were talking about it. So there's there's simply no. Does your case depend on the fact on the on that on the idea that there's no genuine issue of material fact that they were all aware of these incidents? I don't think that our case depends solely on whether there's an issue of fact. I didn't say solely. I said, does it depend on that? Do you still win if they didn't know what was going on? Yes, because they were still all interviewed. They did address. Then we get back to the question I was asking, what about the questions that were asked? They don't seem to be designed to elicit. You know, there's different reasons to have a meeting. One is to is to let everybody know that none of you should be doing this. That's one idea. But that doesn't seem to be the problem. The problem is there's one person out there doing it. And if you want to stop that, you got to catch him or identify him or at least narrow the number of people who might be that person. It seems to me, you know, having a meeting where they assume everybody already knows about it. It's not designed to get information in that they weren't information gathering meetings. I don't understand them to be. So you got to look at what the questions were. The questions look awful big. How do you respond to that? I respond by saying that these were very specific incidents and it was unlikely that besides the perpetrator, anyone was going to have any specific information about seeing that individual placing these things in or on the locker. So what's the what's the use of interviewing them? Well, so the open ended questions, I think, would elicit other things like, hey, you know, so-and-so doing this or the other week I heard so-and-so call someone the N-word. I mean, it would elicit some additional information besides just did you actually see this happen? But it wouldn't get any information about who did these incidents. Is that what you're agreeing? No, because I think if you ask someone, have you seen anyone do something offensive? That if they saw a person taking a new resemble the news and put it on someone's locker, African-American. Yes. Is that one of the questions? Did you see anyone doing anything offensive? I believe it was your honor. I'm sorry. I'll take your time. OK. I believe that was one of the questions. If they have seen anything offensive. We have that. OK, thank you. And so what about the delays? I'm just trying to focus on the strongest arguments your opponent has so that you can respond to them. Absolutely. So I think the other one is that there's these delays. How do you respond to that? So I see that as not being a delay, because what happened is the first incident happened on the morning of August 7th. Very immediately started looking at the video footage that same day. Don Edwards notified Jamie Long and HR. Jamie Long reached out to her supervisor, Sharon Johnson, who reached out to the director of HR, Cindy Newman. They started to come up with a game plan. The first part of that was reviewing the video footage. I don't think there's anything unreasonable about reviewing that footage and trying to maybe narrow the scope of who could be involved in order to before they started interviewing employees. Further, the shift, there's four shifts. And so the two shifts involved in the incident, they would they did not work every single day. So they would be off for two days at a time. So in this week span of, you know, again, what Ms. Cornback is referring to as the delay in the investigation, which she's just talking about the interview. There's more to investigations than simply interviews. So that delay, if you want to call it, that would include two days where none of these employees who were there on the day of the incident were even working. Also, the second incident occurred on a Saturday when Ms. Long was not at the facility. So they needed to, they were taking the time to review the footage. Now they had the second incident. So they're trying to also review that footage. Plus all the footage from around the plant, which contains several hours just to match up clothing and see who could be responsible for it. When the second incident happened, they immediately switched the camera view, started the locker room walkthrough, and then put in the plan to start interviewing once they had kind of narrowed down to, okay, here's who entered the locker or the restroom at the time in question. So again, I don't see that as a delay in starting the investigation. It's simply they started doing a few other things in the investigation before actually sitting down and doing interviews. And as Judge Reese stated, given the circumstances, there is certainly no case law to support that that span of time to start interviews was somehow per se unreasonable. In addition to interviewing and doing the locker room walkthrough, they then started to make plans to move the locker room out. Can I ask you a question about the interview? Can I go back to the interview questions? I'm curious. There are three specific questions, and I think one of them was, have you seen anything offensive? Was there follow-up? How did this interview go? She just asked the three questions, or depending on the response, there was more to it, I assume, or not? Yeah, I mean, she interviewed, she told them why they were there. She interviewed and she asked them the questions. No one, everyone's response was, I don't, you know, they didn't have any information about this particular incident. They didn't see anything. And so, I mean, is this basically like a three-minute interview? Have you seen anything offensive? No, not really. Did you, have you heard anything that makes you uncomfortable now? And then that's it? Like that, was that it? Or what? I don't believe there's anything in the record evidence about how long these lasted, but she did complete each interview with asking the employee. The notes are in the record? The notes are in the record, yes. That's all I've got. All right, your time is up, Ms. Hornback, your rebuttal. Get to that question there. In the interviews, they did develop two different things. One, I mentioned earlier that one of the employees said, there's hate up in here, and also mentioned there had been a previous noose at the business, and there was no follow-up on those two things, no additional training, no work. At what point, at what point was that information about the prior noose developed? Those came up in the first interviews that they did. So that would be after Dance Monkey and the first noose, they did those, that's when those came up. The final interviews they did solicited no additional information at all. And I think I need to talk about, too, what does it mean for them to take this prompt and appropriate corrective action? It has to be reasonably calculated to end the harassment. And there is nothing in this record that shows that anything they did was calculated to end the harassment. Okay, they can move the lockers, then that just means they moved the location where they're going to drop off the noose, and they did. And so the final thing happens, he gets a diner. They do another sort of interview there, find nothing. Once again, it's inconclusive. And then jump forward another month and a half, and he gets another noose that's now in his toolbox. It is cinched into his toolbox, and the noose is there. And it's interesting to me that once we took depositions, their manager of human resources called it a rope, would not concede to me that it was a noose. Even though they use ropes at the business, there is proof in the record that they don't use ropes tied in this manner or this link that was attached to both his locker and to his toolbox. And so it just kind of all goes to show, you know, what else could they have done? And I don't want to be, you know, the quarterback after the fact, but they have, they can do urgent communications. In the middle of all this, they had another employee who had a Carl Loves Big Dicks note put on one of the employees' airspaces, and they immediately sent out an urgent communications to all the supervisors. No urgent communication was done with this. They could have done retraining. They have Bayer University, which is an online training they have. They didn't do that. Didn't bring anybody in to do this. They did nothing really calculated to end this harassment, and it did continue to escalate. At some point, they kind of acted like they were relying on the police. When my client called the police in when he got the death threat of the dying nigger, he called them to come in. They didn't really follow up much with the police. They gave them two names they thought it was. One thing in the district court's record that is completely false, they say that my client, Ronald Burns, is the one who identified the gentleman that they fired and then said, no, that was wrong. You can come back. He was not identified by Mr. Burns. He was allegedly identified via looking at the, I guess, the audio and video recordings that they had at the place. So in general, our point is that nothing very good was reasonably calculated to end this harassment or prevent the harassment that was going on or prevent it going into the future. And the facts of the case show that. This is not a situation where we're asking you to change the law. We were asking you to allow Ron Burns to have his day in court. This is not a case in which there is an absence of proof on behalf of Mr. Burns. There's plenty of proof to show that this was an inadequate, maybe well-intentioned, but completely inadequate to comply with the rules and the regulations required of Title VII to both be as a deterrent to prevent it and also to prevent it from happening in the future. There is no evidence in this case that this company went to its workforce and said that we do not appreciate racial harassment, that we do not allow that to happen in our facility. In fact, all they did was look at some videos, say, oh, we can't do anything, and ask some very vague questions just to show that they were trying to do something very ineffectively. And this escalated to Dining Room. Thank you for your time. We appreciate the argument both of you have given, and we'll consider the case carefully.